# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

EDMEE MARTINEZ, JANE DOE NO. 1,
JANE DOE NO. 2, and JANE DOE NO. 3.

      Plaintiffs,

      v.

JOHN GILLESPIE, MARK FETHERMAN,
JOHN GILLESPIE LAW, P.A., and
BREVARD CRIMINAL ATTORNEYS,

      Defendants.

CASE NO :

**JURY TRIAL DEMANDED**

## COMPLAINT

This is a civil action for damages under the federal Trafficking Victims' Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §§ 1591 and 1595, and related state law claims, arising from Defendants' conduct. Plaintiffs, Edmee Martinez ("MARTINEZ"), Jane Doe No. 1, Jane Doe No. 2, and Jane Doe No. 3 (collectively "Plaintiffs"), respectfully submit their complaint for damages and makes the following averments.

## INTRODUCTION

1.     From 2002 until 2020, John Gillespie ("GILLESPIE"), in coordination with his named and unnamed co-conspirators, to include Defendant Mark FETHERMAN ("FETHERMAN"), acted in consort with each other to sex traffic and sexually batter Plaintiffs using threats, violence, manipulation, deception, debt bondage, controlled substances, and other forms of coercion to compel adults and children[1] to engage in commercial sex acts against their will.

---

[1] 18 U.S.C. § 1591 does not require coercion for a child to be a victim of sex trafficking.

2.      GILLESPIE  is in jail after being arrested on April 18, 2020 for two counts of Human Trafficking for Commercial Sexual Activity of a Child, a violation of Fla. Stat. § 787.06(3)(g), Human Trafficking for Commercial Sexual Activity of an Adult, a violation of Fla. Stat. § 787.06(3)(b), Engaging in Racketeering Activities, a violation of Fla. Stat. § 895.03(3), Conspiracy to Engage in Racketeering Activities, a violation of Fla. Stat. § 895.03(4), and Unlawful Use of a Two-Way Communication Device, a violation of Fla. Stat. § 934.215.

3.      On May 11, 2020, the Office of the Statewide Prosecutor criminally charged GILLESPIE by way of Information.

4.      Gillespie, in coordination with his named and unnamed co-conspirators, orchestrated a scheme to lure, recruit, entice, procure, obtain, maintain, advertise, and transport young girls and women to engage in commercial sex acts through, as well as to commit sexual batteries upon these girls and women.

5.      GILLESPIE specifically sought girls that were minors for this illicit purpose. GILLESPIE would personally engage in sex acts with these young girls in some cases, would cause these young girls to engage in commercial sex acts, or would do both.

6.      This scheme has been continuous, ongoing, and has lasted from at least 2002, until 2020.  The most recent acts perpetuated as a part of this scheme occurred in 2020.

## PARTIES

**A. Plaintiffs.**

1.      Edmee MARTINEZ is a United States citizen that resides in North Carolina.  In 2002, MARTINEZ was vaginally raped by GILLESPIE in Kissimmee, Florida as a minor. MARTINEZ is currently an adult and *sui juris*.

2.      Jane Doe No. 1 is a United States citizen that resides in Florida.  In 2013, Jane Doe

No. 1 was vaginally raped by GILLESPIE in Kissimmee, Florida as part of a sex trafficking venture / enterprise at the age of fifteen.  Jane Doe No. 1 is currently an adult and *sui juris*.

3.      Jane Doe No. 2 is a United States citizen that resides in Florida.  In 2012 – 2014, and 2016, Jane Doe No. 2 was vaginally raped by GILLESPIE as part of a sex trafficking venture / enterprise as an adult.  She was further posted online and sex trafficked to other men on behalf of GILLESPIE and his accomplices. Jane Doe No. 2 is currently an adult and *sui juris*.

4.      Jane Doe No. 3 is a United States citizen that resides in Florida. In 2019 – 2020, she was posted online and sex trafficked to other men on behalf of GILLESPIE and his accomplices. Jane Doe No. 3 is currently an adult and *sui juris*.

5.      Plaintiffs are using pseudonyms because of the highly personal nature of their victimization and because of the serious risk of harm to which they would be exposed if they brought this suit in their actual names.

6.      Because Defendants' victimization of Jane Doe No. 1-3 is part of sex trafficking conspiracy, Plaintiffs reasonably fear retaliation from Gillespie and his unnamed co-conspirators.

7.      Defendant was an attorney and instilled a belief in his clients that he wielded the power of the courts, was untouchable, and would use the legal system to harm Plaintiffs if they turned against him.

8.      Plaintiffs' safety, right to privacy, and personal security outweigh the public interest in knowing their identification.

9.      It is in the public's interest to give anonymity to rape and sex trafficking survivors so that other victims will feel the ability to come forward and not be fearful that their identity will be publicized.

10.      Jane Doe No. 3 will have to admit to activities that potentially have criminal

exposure in order to bring her claims, lending towards a finding of anonymity.

11.     Plaintiffs' legitimate concerns for privacy outweigh any prejudice to Defendant or the public by allowing Jane Does Nos. 1-3 to proceed anonymously.

## B.  Defendants.

12.     Defendant John GILLESPIE is a United States citizen and a resident of the State of Florida.  GILLESPIE is an attorney in the State of Florida and practiced criminal defense in Osceola County, Orange County, and Brevard County. GILLESPIE was admitted to the Florida Bar in 1998 and is currently facing disciplinary procedures[2]  as well as criminal charges.[3]

13.     Defendant Mark FETHERMAN is a United States citizen and a resident of the State of Florida.  FETHERMAN worked closely in consort with GILLESPIE to knowingly provide financial backing for GILLESPIE'S illicit sex trafficking scheme by funding transportation for the victims, funding the equipment to conduct a trafficking scheme, and providing illegal drugs to the victims to further the trafficking scheme.

14.     Defendant Brevard Criminal Attorneys, P.A ("BREVARD CRIMINAL ATTORNEYS") is a Florida Corporation that was founded 5/8/2019 and dissolved 9/25/2020. BREVARD CRIMINAL ATTORNEYS provides legal services, in the State of Florida. GILLESPIE was listed as the sole officer and director of BREVARD CRIMINAL ATTORNEYS, and the company is fully owned, managed, directed, operated, and controlled by GILLESPIE. GILLESPIE handles all of the ordinary business and affairs of the company.

15.     BREVARD CRIMINAL ATTORNEYS knowingly conspired, aided and abetted, facilitated, and directly participated in GILLESPIE'S criminal activity of luring young women and

---

[2] *The Florida Bar v. John Gillespie*, Fla. Bar File. No. 2019-30,691(9C) and 2019-30,789(9C).  Case is currently stayed pending resolution of the criminal charges.
[3] *State of Florida v. John Gillespie*, 48-2020-CF-4800-A-O.

girls and sexually assaulting and trafficking these women and girls.

16.    BREVARD CRIMINAL ATTORNEYS knew or should have known that GILLESPIE was using this law firm to further his sex trafficking venture / enterprise.

17.    Defendant John Gillespie Law, P.A ("JOHN GILLESPIE LAW") is a Florida Corporation that was founded 8/27/2019 and dissolved 9/25/2020.  JOHN GILLESPIE LAW provides legal services, in the State of Florida.  GILLESPIE was listed as the sole officer and director of JOHN GILLESPIE LAW, and the company is fully owned, managed, directed, operated, and controlled by GILLESPIE.  GILLESPIE handles all of the ordinary business and affairs of the company.

18.    JOHN GILLESPIE LAW knowingly conspired, aided and abetted, facilitated, and directly participated in GILLESPIE'S criminal activity of luring young women and girls and sexually assaulting and trafficking these women and girls.

19.    JOHN GILLESPIE LAW knew or should have known that GILLESPIE was using this law firm to further his sex trafficking venture / enterprise.

## JURISDICTION AND VENUE

20.    This Court has federal question subject-matter jurisdiction, pursuant to 28 U.S.C. § 1331, because Plaintiffs bring this action under 18 U.S.C. § 1595.

21.    This Court has diversity subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and the parties have minimal diversity, insofar as Jane Doe Nos. 1, 2, and 3 are Florida residents, MARTINEZ is a North Carolina resident, Defendant FETHERMAN is a Florida resident, Defendant GILLESPIE lives in Florida and North Carolina, and the law firm Defendants are Florida corporations.

22.     This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 because all the other claims are related to the claims with original jurisdiction and form part of the same case or controversy.

23.     Plaintiffs' claims arise out of the same series of transactions or occurrences and share common questions of law or fact.  The essential facts of Plaintiffs' claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in a single lawsuit.

24.     Venue is proper in this district pursuant to 28 U.S.C. §1391 because all of the events or omissions giving rise to the claims asserted in this action, including the Defendants' misconduct and omissions, occurred in the judicial district where this action is brought.

25.     Whenever reference is made in this Complaint to any act, deed or conduct of the Defendant(s), the allegation is that the Defendant(s) engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Defendant(s).

## LEGAL BACKGROUND

26.     The federal Trafficking Victims Protection Reauthorization Act, 18 U.S.C. §§ 1591, 1595 outlaws sex trafficking activities that affect interstate or foreign commerce or take place within the territorial jurisdiction of the United States.  It is to be construed expansively because it serves a remedial purpose and uses intentionally broad language.

27.     The federal sex trafficking statute, 18 U.S.C. § 1591(a), criminalizes any person acting in interstate or foreign commerce, or within the territorial or maritime jurisdiction of the United States, who knowingly:

(1) … recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or

(2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),

knowing, or … in reckless disregard of the fact, that means of force, threats of force, fraud, coercion …, or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act ….

28.     The TVPRA, 18 U.S.C. § 1595, provides a civil remedy to victims of sex trafficking crimes against the perpetrator of such crimes and against anyone else who knowingly benefits, financially or by receiving anything of value, from participation in a venture which that person knew or should have known has engaged in a sex trafficking crime. 18 U.S.C. §1595(a).

29.     The Florida sex trafficking civil cause of action, F.S. 772.104, provides a civil remedy to victims of sex trafficking or human trafficking if that person was injured by an individual with criminal intent that acquires, maintains, or derives proceeds from the unlawful debt of that person.  The same applies to those that are employed by, associated with, or conspire with such an enterprise.

## FACTUAL ALLEGATIONS

### A.  Defendant GILLESPIE and Co-Conspirators Engaged in a Sex Trafficking Venture / Enterprise

30.     GILLESPIE was admitted to the Florida Bar in 1988.  Since that time, he has practiced in the fields of criminal law and family law, amongst other areas.

31.     GILLESPIE has used his position as an attorney to conspire with his accomplices to facilitate a sex trafficking venture / enterprise.

32.     Starting in or about 2002, GILLESPIE proposed to his legal assistant that she should recruit young girls in clubs to meet Gillespie, engage in sexual activity with Gillespie, and

work for GILLESPIE as sex workers.

33.     GILLESPIE taught his legal assistant how to effectively recruit his potential victims, to include underage victims.

34.     In a coordinated venture / enterprise with Gillespie, his legal assistant met many girls and women that she lured and enticed to meet Gillespie, engaged in sex acts with Gillespie, and engage in commercial sex acts for Gillespie.

35.     Upon information and belief, GILLESPIE used his legal practice(s) to meet girls arrested for prostitution or drugs, by offering the ability to "work off" the legal fees through sex acts with Gillespie, and commercial sex acts for GILLESPIE'S financial gain.

36.     GILLESPIE included many other recruiters in his sex trafficking venture / enterprise.

37.     When GILLESPIE had male clients that could not afford his legal services, he had the females in their life "work off" the debt to pay his fees.  In fact, GILLESPIE included one such male clients' mother, Sandra EWING, in such a venture / enterprise.

38.     Sandra EWING, in a coordinated venture / enterprise with Gillespie, used GILLESPIE'S legal representation, in combination with the debt owed to GILLESPIE for past legal representation, to sex traffic the girlfriend of EWING's son.

39.     GILLESPIE used his legal practice to represent other sex traffickers and used his legal relationship with them to facilitate a venture / enterprise in which that trafficker would bring GILLESPIE a supply of new victims.

40.     GILLESPIE used drug addiction to ensure compliance with his sex trafficking venture / enterprise.

41.     Certain Schedule I drugs, such as heroin, methamphetamine, and cocaine,

chemically alter the brain of the person using the drug to form a stronger chemical dependency on the substance.[4]

42.     GILLESPIE kept large quantities of drugs in his possession.

43.     GILLESPIE would provide large quantities of these drugs to potential new victims under the false pretense that the drugs were a gift, and then would create a debt-servitude by demanding payment after the drugs were consumed.  At that point, the addiction was far more severe than before the victim met Gillespie.

44.     GILLESPIE would mandate victims complete commercial sex acts before he would supply them with enough of the drug not to become sick from withdrawal symptoms.

**A.  Edmee MARTINEZ**

45.     In November 2002, when MARTINEZ was sixteen years old, she ran away from home.

46.     While a runaway, and needing money for food and shelter, MARTINEZ began staying with an older girl whom she believed to be a friend.

47.     This girl was GILLESPIE'S legal assistant.

48.     The legal assistant was engaged in a venture / enterprise with GILLESPIE, in which she would meet girls at clubs and other venues and would bring them to GILLESPIE so that he could engage in sexual activity with them and/or post them online for the purpose of selling that child for commercial sex.  GILLESPIE compensated his legal assistant for her recruitment efforts, which was separate and apart from her clerical job with GILLESPIE'S law office.

49.     The legal assistant encouraged MARTINEZ to begin working at a strip club in

---

[4] Effects of Drugs on The Brain & Neurotransmitters, https:// americanaddictioncenters.org/health-complications-addiction/central-nervous-system (last viewed Jan. 31, 2022).

Eatonville, Florida and become a dancer.

50.    MARTINEZ looked very young.

51.    The legal assistant knew MARTINEZ was underage and provided MARTINEZ with a fake ID so that she could work as a dancer.

52.    Shortly after she began working at the club, the legal assistant recruited and solicited MARTINEZ by asking her to do "a favor" and "dance" for her criminal defense attorney, GILLESPIE.

53.    MARTINEZ agreed to dance for GILLESPIE. At no point did she believe sexual activity would be involved.

54.    The legal assistant transported MARTINEZ to GILLESPIE'S law office, located in Kissimmee, Florida, where she met GILLESPIE.

55.    The legal assistant did not come inside with MARTINEZ.

56.    GILLESPIE spontaneously offered MARTINEZ a glass of water.

57.    Upon information and belief, GILLESPIE drugged the glass of water he offered to MARTINEZ.

58.    Shortly after drinking the water, MARTINEZ began to feel strange.  Her head became cloudy, she had trouble seeing and hearing, she had trouble moving her arms and legs, and lost control of her body.

59.    GILLESPIE had set up a sleeping cot in his office before MARTINEZ arrived.

60.    When MARTINEZ told GILLESPIE she didn't feel well, he immediately told her he had somewhere she could lay down and guided her to the cot.

61.    GILLESPIE then sexually battered sixteen-year-old MARTINEZ by engaged in vaginal sex with her, without consent and against her will while she was drugged and unable to

move or resist.

62.    After the sexual battery concluded, and MARTINEZ started to regain the use of her extremities, GILLESPIE helped MARTINEZ make her way out to the legal assistant's car.

63.    The legal assistant drove MARTINEZ away from GILLESPIE'S office and dropped her off at a store on the side of the road in Kissimmee, Florida.

64.    Consequently, MARTINEZ has been physically, psychologically, financially, and/or reputationally harmed by Gillespie.

**B.  Jane Doe No. 1**

65.    In 2013, Jane Doe No. 1 was a fifteen-year-old runaway.

66.    She met and was recruited to work for sex trafficker, Montavius Rakeem Postell ("POSTELL"), who went by the street name of "King."

67.    POSTELL was violent and Jane Doe No. 1 feared him greatly.  She was not able to tell POSTELL "no" or refuse his directions or he would beat her severely.  POSTELL forced Jane Doe No. 1 to engage in numerous sex acts, provided her drugs, and Jane Doe No. 1 made approximately $1000 per day performing commercial sex acts.  POSTELL kept all the money and continued to promote Jane Doe No. 1 to his regulars and on Backpage.com.

68.    Backpage.com was a website that allowed for the sale and sex trafficking of individuals online.  Backpage.com was shut down in 2016 by the Federal Bureau of Investigation for facilitating and profiting from sex trafficking and serving as the "leading forum for prostitution ads."[5]

---

[5] Backpage.com (last viewed January 25, 2022); *Justice Department Leads Effort to Seize Backpage.Com, the Internet's Leading Forum for Prostitution Ads, and Obtains 93-Count Federal Indictment*  https://www.justice.gov/ opa/pr/justice-department -leads-effort-seize-backpagecom-internet-s-leading-forum-prostitution-ads (last viewed January 25, 2022).

69.     After a couple months with POSTELL, she was told that she was going to "meet his lawyer."

70.     Before the meeting, POSTELL instructed Jane Doe No. 1 to "dress up."  At this point, Jane Doe No. 1 did not know that she would be required to engage in sexual activity.

71.     POSTELL drove Jane Doe No. 1, along with another victim, to meet his lawyer, GILLESPIE, at the courthouse.

72.     After court was concluded, it became clear that GILLESPIE'S payment for legal representation of POSTELL was sex with Jane Doe No. 1.

73.     POSTELL then drove Jane Doe No. 1 and another victim to GILLESPIE'S office.

74.     POSTELL and the other girl went inside to speak to GILLESPIE.

75.     Upon returning to the car, POSTELL handed Jane Doe No. 1 a condom and instructed her to "have sex" with GILLESPIE inside GILLESPIE'S law office.

76.     Jane Doe No. 1 did not want to be there and was extremely uncomfortable.  She obeyed POSTELL'S orders however, and out of fear, Jane Doe No. 1 went inside.

77.     While inside, GILLESPIE engaged in vaginal sex on a conference table inside the law practice with fifteen-year-old Jane Doe No. 1.

78.     Upon completion, Jane Doe No. 1 returned to POSTELL'S car.

79.     The window was cracked in the vehicle, which allowed Jane Doe. No. 1 to hear the conversation between POSTELL and GILLESPIE.

80.     GILLESPIE complained that Jane Doe No. 1 was too "inexperienced" because she did not make "enough noises" during the sex act.  POSTELL replied that he had provided this girl because she was young, blonde hair, and blue eyes and "that's the dream."

81.     GILLESPIE then stated to POSTELL that Jane Doe No. 1 did look "really young."

82. Once Jane Doe No. 1 and POSTELL were back in the car again, POSTELL threatened her to "do better" next time.  He stated that his lawyer "did not like her" and he had never had a problem with his lawyer and other girls he had brought.

83. POSTELL received something of value for Jane Doe No. 1's sex acts; GILLESPIE gave POSTELL $40.00 as a tip and free legal services in exchange for sex acts with Jane Doe No. 1 and other females.

84. On multiple occasions after that, POSTELL drove Jane Doe No. 1 back to GILLESPIE'S office.  Since GILLESPIE did not like Jane Doe No. 1, the other victim was required to go inside and perform the sex acts with GILLESPIE at POSTELL'S instruction.

85. In July 2013, POSTELL was arrested for Human Trafficking of a Child and Lewd and Lascivious Battery of a Child 12-15 Years Old in Orange County, Florida.[6]  The victim in this case was Jane Doe No. 1.

86. On May 14, 2014, POSTELL was convicted of these charges and sentenced to ten years in the Florida Department of Corrections.

87. Consequently, Jane Doe No. 1 has been physically, psychologically, financially, and/or reputationally harmed by GILLESPIE.

**C.  Jane Doe No. 2**

88. Jane Doe No. 2 began dating Matt Hutchinson ("HUTCHINSON") in or around 2006 and continued to date him into 2012.

89. Jane Doe No. 2 and HUTCHINSON have two children together, M.H. (born 2008), and J.H. (born 2012).

90. HUTCHINSON lived with his mother, Sandra Ewing ("EWING").  Jane Doe No.

---

[6] *State of Florida v. Montavius Rakeem Postell*, 48-2013-CF-9078-A-O.

2 moved in with HUTCHINSON and EWING in or about 2006 when she and HUTCHINSON started dating.

91.     HUTCHINSON was a drug addict and repeatedly got arrested for drug related crimes.

92.     HUTCHINSON had retained GILLESPIE as his counsel to defend him in multiple cases throughout Central Florida.

93.     On July 4, 2012, Jane Doe No. 2 and HUTCHINSON got into a physical altercation.  Jane Doe No. 2 was arrested again.  GILLESPIE was her attorney of record.

94.     While no criminal charges were pursued, the Department of Children and Families gave temporary custody of the children to EWING.

95.     On November 30, 2012, HUTCHINSON was convicted and sent to the Department of Corrections.  He was released from custody on January 17, 2015.  GILLESPIE and another attorney were HUTCHINSON'S attorneys of record.

96.     On July 29, 2016, HUTCHINSON was convicted again and sent to the Department of Corrections.  He was released from custody on December 20, 2017.  GILLESPIE and another attorney were his attorneys of record.

97.     During the time that HUTCHINSON was in prison, Jane Doe No. 2 continued to live with EWING.  Jane Doe No. 2 was financially dependent on EWING, and EWING had her children.

98.     Upon information and belief, HUTCHINSON owed GILLESPIE money for legal fees.  As an alternative to paying with money, GILLESPIE agreed to allow EWING's daughter, S.H., "pay" for his legal services with sexual services to "supplement" the financial deficiency.

99.     Jane Doe No. 2 witnessed GILLESPIE provide money to S.H. for illegal drugs

upon request on numerous occasions and they openly discussed her payment to GILLESPIE with sexual services.

100.    When S.H. went to jail and was no longer available to GILLESPIE, Jane Doe No. 2 overheard GILLESPIE ask EWING if she would "give [him] [Jane Doe No. 2] for the night." Without asking or consulting Jane Doe No. 2, EWING agreed.

101.    EWING separately took Jane Doe No. 2 to the ATM with her to make the point that her account was empty, and Jane Doe No. 2 needed to "do her part" by having commercial sex with GILLESPIE to pay HUTCHINSON'S legal fees.  EWING additionally told Jane Doe No. 2 that EWING had custody of her children and if she did not agree, she would leave the state with Jane Doe No. 2's children and Jane Doe No. 2 would never see them again.  This was reinforced by the fact that GILLESPIE was an attorney and could fight against Jane Doe No. 2 in court.

102.    The obvious conflict of interest was not discussed, and Jane Doe No. 2 was not aware of such a conflict.

103.    Due to be financially dependent on EWING and the threat of never seeing her children again, Jane Doe No. 2 was powerless and was coerced into engaging in sexual acts with GILLESPIE the first time in 2012 as a "payment" for HUTCHINSON'S legal representation.

104.    Jane Doe No. 2 believed that if she did not comply, her children would disappear.

105.    After this first time, Jane Doe No. 2 overheard GILLESPIE and EWING conspiring to have Jane Doe No. 2 posted on Backpage, have her engage in sex acts for profit, and plans to increase the number of victims in their control to "double the profits."

106.    Shortly thereafter, EWING converted a portion of her residence to be where Jane Doe No. 2 was required to conduct her sex work.

107.    EWING and GILLESPIE, conspired to force and/or coerce Jane Doe No. 2 into commercial sex work.  She was posted on Backpage for approximately a month, and then that was moved to USA Sex Guide, another similar online exploitation website.

108.    Under the duress of losing her children, Jane Doe No. 2 was seeing between five (5) to ten (10) men a week, to include regulars, and was engaging in sex acts with each of these men.  EWING would collect the money from each of these men and, upon information and belief, would share a portion with GILLESPIE.

109.    In 2014, Jane Doe No. 2 finally told HUTCHINSON what had been happening to her and he demanded of his mother, EWING, that the sex trafficking of Jane Doe No. 2 cease.

110.    From 2014 – 2016, Jane Doe No. 2 was not required to perform sexual acts under the threat of losing her children.  Nonetheless, EWING maintained temporary custody of her children.

111.    In 2016, money became tight again for EWING and money was still owed to GILLESPIE.

112.    EWING threatened Jane Doe No. 2 that if she did not start engaging in commercial sex acts again, EWING was going to leave with the children for Arizona.

113.    During this time, Jane Doe No. 2 was attempting to regain custody of her children.

114.    Upon information and belief, John GILLESPIE legally represented EWING in this matter against Jane Doe No. 2, or Jane Doe No. 2 was led to believe this was the case.

115.    EWING withheld mail to cause Jane Doe No. 2 to miss important court dates, detrimentally affecting her ability to win her custody case.

116.    To date, EWING still has Jane Doe No. 2's children and upon information and belief, has left the State of Florida.  Jane Doe No. 2 does not know where her children are currently.

16

117.    Jane Doe No. 2 has been physically, psychologically, financially, and/or reputationally harmed by GILLESPIE.

**D.  Jane Doe No. 3**

118.    In late 2019, Jane Doe No. 3 was introduced by a mutual friend to GILLESPIE.

119.    Knowing that Jane Doe No. 3 was an addict and was currently homeless, GILLESPIE and his female partner offered Jane Doe No. 3 her drug of choice, a free place to stay, food, assistance to get sober, and free legal help to get her children back in an ongoing dependency case.

120.    At the time the drugs were offered to Jane Doe No. 3, neither GILLESPIE nor his female partner told Jane Doe No. 3 that these things would cost her and she was deliberately led to believe these were being offered without cost.

121.    GILLESPIE and his female partner deceptively offered to provide her with suboxone to get "clean."

122.    In reality, GILLESPIE supplied Jane Doe No. 3 continually with drugs.

123.    For the first two to three weeks with GILLESPIE, he provided such a heavy supply of drugs to Jane Doe No. 3 that it severely increased her tolerance and her drug dependency.

124.    After this, Jane Doe No. 3 was informed that she had a debt that had to be paid and she would need to pay for her housing and the drugs she had already consumed.

125.    When Jane Doe No. 3 could not afford to pay her debt, she was told that she could work off her debt with commercial sex acts.

126.    Despite the commercial sex acts she performed, she continued to use drugs, supplied by GILLESPIE, and therefore was never able to be out of "debt" to him.

127.    Jane Doe No. 3 was photographed and "posted" on Skipthegames.com, a sexual

exploitation website used to solicit and procure sex buyers, as well as other similar exploitation websites.

128.    These sex buyers would respond to the online advertisements for the sale of Jane Doe No. 3, and would arrange to come to GILLESPIE'S home to engage in the negotiated sexual acts.

129.    Jane Doe No. 3 engaged in sex acts with each of these men.

130.    The money exchanged for each sexual act with Jane Doe No. 3 was immediately given to GILLESPIE and GILLESPIE received the proceeds from this sex trafficking activity.

131.    This occurred on more than one occasion.

132.    During this time, FETHERMAN paid the rent and the bills to ensure the house was operational, he provided the vehicle that drove Jane Doe No. 3 to outcalls, he paid for the drugs that were used to intoxicate Jane Doe No. 3, and he paid for the multiple phones used to connect with sex buyers to facilitate commercial sex.

133.    Jane Doe No. 3 heard GILLESPIE explain the full operational sex trafficking plan to FETHERMAN, to include the sex trafficking of Jane Doe No. 3 and others.  FETHERMAN also provide GILLESPIE advice on how to expand and grow his illegal venture / enterprise.

134.    To ensure compliance with his directions, GILLESPIE coerced Jane Doe No. 3 to commit sex acts through drugs, violence, promises of legal help, and threats.

135.    When Jane Doe No. 3 began to experience severe withdrawal symptoms, GILLESPIE would deny her drugs to stop the withdrawal symptoms unless she engaged in commercial sex acts.

136.    When Jane Doe No. 3 was not compliant or willing to engage in sex acts, GILLESPIE physically struck her, causing her harm, on one or more occasions.

137.    When Jane Doe No. 3 was not compliant, he would threaten to make her homeless and return her to living on the streets without food or shelter.

138.    During this time, Jane Doe No. 3 had an ongoing dependency case in Court. GILLESPIE continually promised her that he would handle her legal matters for her and was working as a lawyer with both BREVARD CRIMINAL ATTORNEYS and/or JOHN GILLESPIE LAW at the time.

139.    GILLESPIE and Jane Doe No. 3 were in privity of contract.

140.    Jane Doe No. 3 confided her legal issues to GILLESPIE in the context of an attorney-client relationship.  GILLESPIE agreed to take her case.

141.    Jane Doe No. 3 understood that she had to commit commercial sex acts to pay for GILLESPIE'S legal services.

142.    GILLESPIE, as the attorney employed by both BREVARD CRIMINAL ATTORNEYS and JOHN GILLESPIE LAW neglected to bring a legal case on behalf of Jane Doe No. 3, resulting in a negative outcome through the dependency proceeding.

143.    When Jane Doe No. 3 was arrested on February 8, 2020, GILLESPIE and his female partner bonded her out on February 16, 2020 and GILLESPIE promised to handle the criminal defense legal issues for her.

144.    GILLESPIE received something of value in exchange for the sex acts, to-wit: money.

145.    Jane Doe No. 3 received something of value in exchange for the sex acts, to-with: she was provided a place to live, food to eat, a phone, and drugs to sustain her addiction.

146.    Jane Doe No. 3 has been physically, psychologically, financially, and/or reputationally harmed by GILLESPIE, BREVARD CRIMINAL ATTORNEYS, JOHN

GILLESPIE LAW, and FETHERMAN.

**E.  Plaintiffs were Prevented from Previously Pursuing Their Claims.**

147.    GILLESPIE'S venture / enterprise to engage in both sex trafficking and rape has been ongoing and continuous since at least 2002.  GILLESPIE'S venture / enterprise has involved a myriad of co-conspirators and accomplices over the years.

148.    MARTINEZ was prevented from previously pursuing her claims.  In November 2002 when her sexual assault occurred, MARTINEZ was threatened by GILLESPIE'S legal assistant that if she did not comply with the demanded sex acts, or spoke about what happened, she would be killed.

149.    GILLESPIE furthered her fears because directly after this incident occurred, she attended Court.  In Court, GILLESPIE entered the courtroom, spoke to one of the Court personnel and left.  GILLESPIE'S profession as a lawyer, and his presence in Court immediately after he assaulted her, furthered MARTINEZ's fear of harm and a belief that the Court system would not and could not help or protect her.

150.    Notably, even when she reported the legal assistant's actions to law enforcement, she did not mention GILLESPIE'S name.

151.    Jane Doe No. 2 had the legal system award custody of her children to EWING. EWING, with GILLESPIE'S help, was able to coerce and compel Jane Doe No. 2 into commercial sex acts under the threat of losing her children.  She was threatened to remain silent and to comply or she would never see her children again.

152.    Jane Doe No. 2 had the very courts that should protect her give her children to one of her traffickers.

153.    Jane Doe No. 2's children are with EWING out of state and Jane Doe No. 2 does not know where they are or if they are safe.

154.    Jane Doe No. 2's fear for her children's safety is still ongoing.

155.    The violent nature of rape,[7] along with the coordinated methods of coercion and intimidation by GILLESPIE and co-conspirators, caused Plaintiffs significant mental and emotional harm such that they felt they could not re-traumatize[8] [9] themselves or further endanger themselves by going up against powerful men, backed by the very court system that they would report to.  "[T]he trauma experienced by victims of trafficking includes anxiety, depression, alienation, disorientation, aggression, suicide ideation, attention deficit, and post-traumatic stress disorder (PTSD)."[10] Further, that "trauma worsens during the trafficking process and persists far beyond the end of any exploitation."[11]

156.    Studies show that rape is one of the least reported of all violent crimes in the United

---

[7] "Rape is one of the most severe of all traumas, causing multiple, long-term negative outcomes, such as post-traumatic stress disorder (PTSD), depression, substance abuse, suicidality, repeated sexual victimization, and chronic physical health problems." Kilpatrick, D. G., & Acierno, R.: "Mental health needs of crime victims: Epidemiology and outcomes." Journal of Traumatic Stress, Vol. 16, 2003, pp119–132.

[8] "When victims reach out for help, they place a great deal of trust in the legal, medical, and mental health systems as they risk disbelief, blame, and refusals of help. How these system interactions unfold can have profound implications for victims' recovery." Campbell, Rebecca, "The Psychological Impact of Rape Victims' Experiences With the Legal, Medical, and Mental Health Systems," American Psychologist, November 2008, p. 702.

[9] "Post-assault help seeking can become a "second rape," a secondary victimization to the initial trauma." Campbell, R., & Raja, S., "The secondary victimization of rape victims: Insights from mental health professionals who treat survivors of violence." *Violence & Victims, 14,* 2008, 261–275.

[10] Okech, David, *et. al.*, "Social Support, Dysfunctional Coping, and Community Reintegration as Predictors of PTSD Among Human Trafficking Survivors." Behavioral Medicine, Vol. 44, 2018, 209-218).

[11] *Id.*

States and that victims do not report because of fear of retaliation from their perpetrator.

157.     Studies also show that negative social consequences to disclosing rape to family members and friends form significant inhibitions, further incapacitating victims to speak about their experiences even to people they love and trust.  These include notions of becoming an emotional burden, experiencing a loss of privacy, being shamed and blamed, being disbelieved, being labelled and as such, being unable to move out from under a negative label, and being the cause of mental and emotional strife for the person/people they disclose to.

158.     Now that GILLESPIE has been arrested and incarcerated and now that he no longer is eligible to practice law in the State of Florida, Plaintiffs finally feel safe coming forward to pursue their claims.

## CAUSES OF ACTION

## COUNT I
## VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION REATHORIZATION ACT, 18 U.S.C. § 1595

*(Jane Doe No. 1 v. Gillespie;*
*Jane Doe No. 2 v. Gillespie;*
*Jane Doe No. 3, v. Gillespie, Brevard Criminal Attorneys, John Gillespie Law)*

159.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1-159, as if fully set forth in this Count.

160.     The acts described herein occurred in or affected interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States.

161.     Pursuant to 18 U.S.C. § 1595, a civil action may be brought for any violation of Chapter 77 against (1) the perpetrator or (2) whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter.

162.   **18 U.S.C. §§ 1591(a)(1) and 1595(a):** Plaintiffs are victims of violations of Chapter 77 of Title 18 of the United States Code, to wit, 18 U.S.C. §§ 1591(a)(1) and 1595(a), insofar as Defendants were acting in concert when they knowingly recruited, enticed, harbored, transported, provided, obtained, maintained, patronized, and/or solicited Plaintiffs by multiple means to commit one or more commercial sex acts [as defined at 18 U.S.C. § 1591(e)(3)].

163.   For the Plaintiffs that were minors at the time of the conduct, MARTINEZ and Jane Doe No. 1, Defendant GILLESPIE and/or others acting in concert with him, such as POSTELL and GILLESPIE'S legal assistant, committed the acts described above and knew or should have known, that the Plaintiff had not reached 18 years of age and would be caused to engage in one or more commercial sex acts.

164.   For adult Plaintiff Jane Doe Nos. 2, Defendant GILLESPIE, and/or others acting in concert with him committed the acts described above and knew or should have known that means of force, threats of force, coercion [as defined at 18 U.S.C. § 1591(e)(2)], or any combination of such means would be used to cause Plaintiffs to engage in one or more commercial sex acts.

165.   For adult Plaintiff Jane Doe Nos. 3, Defendants GILLESPIE, Brevard Criminal Attorneys, John GILLESPIE Law, and/or others acting in concert with them committed the acts described above and knew or should have known that means of force, threats of force, coercion [as defined at 18 U.S.C. § 1591(e)(2)], or any combination of such means would be used to cause Plaintiffs to engage in one or more commercial sex acts.

166.   **18 U.S.C. §§ 1591(a)(2) and 1595(a):** Plaintiffs are victims of violations of Chapter 77 of Title 18 of the United States Code, to wit, 18 U.S.C. §§ 1591(a)(2) and 1595(a), insofar as for Plaintiffs, Defendants GILLESPIE, BREVARD CRIMINAL ATTORNEYS, JOHN GILLESPIE LAW, and others acting in concert with them, knowingly benefitted, financially or by

receiving anything of value, from participation in a venture [as defined at 18 U.S.C. § 1591(e)(6)] which Defendants knew or should have known had engaged in recruiting, enticing, harboring, transporting, providing, obtaining, maintaining, patronizing, and/or soliciting Plaintiffs by multiple means to commit one or more commercial sex acts.

## COUNT II

### SEXUAL BATTERY IN VIOLATION OF
### FLORIDA STATUTES § 794.005, et. seq. AND COMMON LAW

*(Edmee Martinez v. Gillespie;*
*Jane Doe No. 1 v. Gillespie;*
*Jane Doe No. 2 v. Gillespie;*
*Jane Doe No. 3 v. Gillespie)*

167.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1-159, as if fully set forth in this Count.

168.    Defendant GILLESPIE committed a battery upon MARTINEZ consisting of intentional, harmful, unwanted and offensive sexual contact upon her vaginal area.

169.    Defendant GILLESPIE committed a battery upon Jane Doe No. 1 consisting of intentional, harmful, unwanted and offensive sexual contact upon her vaginal area.

170.    Defendant GILLESPIE committed a battery upon Jane Doe No. 2 consisting of intentional, harmful, unwanted and offensive sexual contact upon her vaginal area.

171.    Defendant GILLESPIE committed a battery upon Jane Doe No. 3 consisting of intentional, harmful, unwanted and offensive sexual contact upon her vaginal area.

172.    As a direct and proximate cause of the foregoing, Plaintiffs have suffered psychological, emotional, and physical injuries, emotional distress, mental anguish, pain and suffering and the loss of enjoyment of life.

## COUNT III

### FALSE IMPRISONMENT IN VIOLATION OF
### FLORIDA STATUTES § 787.02 AND COMMON LAW

*(Edmee Martinez v. Gillespie;*
*Jane Doe No. 2 v. Gillespie)*

173.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1-159, as if fully set forth in this Count.

174.    Defendant GILLESPIE falsely imprisoned MARTINEZ when he drugged her water to immobilize her so that he could sexually batter her.

175.    This immobilization was against MARTINEZ'S will, GILLESPIE had no legal authority or color of authority to act in this manner, and his actions were unreasonable and unwarranted.

176.    Defendant GILLESPIE falsely imprisoned Jane Doe No. 2 when he, in cohort with EWING, caused Jane Doe No. 2 to be in a room at EWING'S house with GILLESPIE so that he could sexually batter her, with the threat of losing her children used as leverage to prevent her from leaving the room.

177.    Being in the room with GILLESPIE was against Jane Doe No. 2's will, GILLESPIE had no legal authority or color of authority to act in this manner, and his actions were unreasonable and unwarranted.

178.    As a direct and proximate cause of the foregoing, Plaintiffs have suffered psychological, emotional, and physical injuries, emotional distress, mental anguish, pain and suffering and the loss of enjoyment of life.

## COUNT IV

## FLORIDA CIVIL REMEDIES FOR CRIMINAL PRACTICES § 772.104

(*Jane Doe No. 3 v. GILLESPIE, FETHERMAN, BREVARD CRIMINAL ATTORNEYS, and JOHN GILLESPIE LAW*)

179.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1-159, as if fully set forth in this Count.

180.    Defendant GILLESPIE, with criminal intent, conspired to, endeavored to, and received proceeds from the sex trafficking of Jane Doe No. 3, directly or indirectly, from a pattern of criminal activity.

181.    Defendant GILLESPIE, with criminal intent, conspired to, endeavored to, collected a debt from Jane Doe No. 3 that was created through deception with a false offer of free housing, drugs, food, transportation, and legal services.  Through the illegal enterprise, GILLESPIE, BREVARD CRIMINAL ATTORNEYS, and/or JOHN GILLESPIE LAW, collected this debt by forcing and/or coercing Jane Doe No. 3 to engage in sex trafficking.

182.    Defendants GILLESPIE and FETHERMAN, through a pattern of criminal sex trafficking and drug distribution activity, as well as through the collection of an unlawful debt from Jane Doe No. 3, conspired to, endeavored to, or did actually acquire or maintain, directly or indirectly, control of the enterprise.

183.    Defendants GILLESPIE, BREVARD CRIMINAL ATTORNEYS, JOHN GILLESPIE LAW, and FETHERMAN acted with the intent to establish and/or operate an enterprise.

184.    Defendants GILLESPIE and FETHERMAN are employed by and/or associated with, the sex trafficking enterprise to conduct or participate, directly or indirectly, in the enterprise through a pattern of criminal activity, and/or the collection of an unlawful debt.

185.     As a direct and proximate cause of the foregoing, Plaintiffs have suffered psychological, emotional, and physical injuries, emotional distress, mental anguish, pain and suffering and the loss of enjoyment of life.

## COUNT V

## LEGAL MALPRACTICE

*(Jane Doe No. 3 v. GILLESPIE, BREVARD CRIMINAL ATTORNEYS, and JOHN GILLESPIE LAW)*

186.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1-159, as if fully set forth in this Count.

187.     GILLESPIE was at all material times a paid employee and managing agent of BREVARD CRIMINAL ATTORNEYS, and/or JOHN GILLESPIE LAW.

188.     BREVARD CRIMINAL ATTORNEYS, and JOHN GILLESPIE LAW authorized GILLESPIE to represent clients, such as Jane Doe No. 3, as her lawyer, employed by these law firms.

189.     GILLESPIE was retained by Jane Doe No. 3 to assist her with her with a legal case.

190.     GILLESPIE failed in his duty to adequately represent her interests.

191.     Jane Doe No. 3 was negatively impacted in her case as a direct and proximate result of GILLESPIE'S failure to adequately represent her interests.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs demand judgment against all the Defendants on each of the above-referenced claims and Counts and as follows:

   a.   All available compensatory damages for the described losses with respect to each cause of action;

b.   past and future medical expenses, as well as the costs associated with past and

future life care;

c.   past and future lost wages and loss of earning capacity;

d.    past and future emotional distress;

e.   consequential and/or special damages;

f.   all available noneconomic damages, including without limitation pain, suffering,

and loss of enjoyment of life;

g.   restitution;

h.   punitive damages;

i.   reasonable and recoverable attorneys' fees;

j.   costs of this action; and

k.   pre-judgment and all other interest recoverable.


## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.


DATED: February 8, 2022                    */s/ Lisa D. Haba*
                                           Lisa D. Haba (FBN 077535)
                                           **THE HABA LAW FIRM, P.A.**
                                           1220 Commerce Park Dr., Suite 207
                                           Longwood, FL 32779
                                           Telephone: (844) 422-2529
                                           lisahaba@habalaw.com